The next case called for oral argument is In Re of the Estate of Krummel. Okay, In Re of the Estate of Krummel is the next case. Council, whenever you're ready, you may proceed. May it please the court. My name is Ellen Edmonds and I represent the appellate Shirley Passley. Ms. Passley is a party to an action involving the probate and trust estate of her deceased mother, Mary Fern Krummel. This is appeal pursuant to Supreme Court Rule 304B1 of a decision in the state which finally determined the right of my client, Shirley Passley, by denying her request to set aside a self-dealing real estate transaction by the executor trustee of the estate, Fred Krummel. Before addressing the legal issues, I would like to just briefly summarize factually the irregularities relating to the real estate transaction in question. The primary issue, obviously, is that the executor trustee sold land to himself, which had been left under the trust, to Shirley Passley and to her sister. The executor claims that he had an enforceable agreement to purchase the land, and that claim is based on a preliminary verbal discussion between himself and my client, Shirley Passley, in which she indicated a tentative agreement to sell her land to him at its appraised value. It was a verbal discussion only, and that was really the only term, and Fred Krummel acknowledges that that was the only term of the agreement or the purported agreement that was discussed. My client testified that after they had this preliminary verbal discussion, she expected a contract to be provided to her for some other paperwork for her to review and approve, and that was never forthcoming. No other paperwork was provided, and she didn't know until months later, neither she nor the other land beneficiaries knew until months later that the land transaction had actually gone through. The record establishes that Fred Krummel, the executor trustee, filed an ex parte petition with the court and secured an ex parte order authorizing him to execute a trustee's deed transferring the land to himself. You dispute that when they made their original agreement about the price, there was no second appraisal? At the time they had the initial discussion, the second appraisal could not have been performed. But you said discussion, didn't they have an agreement that would be a fair price? Well, I think that there was an initial discussion that they would buy out the appraised value, and he did provide them an appraisal, and at that time she had no, I don't think she ever overtly said that's a fair price, she just had no reason to think otherwise. She testified at the time that she had no reason to think that there was any problem with the appraised value at that time. During the course of the land, or prior to the transfer of the land, Fred Krummel went to his bank to secure financing for the purchase of the land, and the bank performed the second appraisal in order to provide that financing. He did not indicate to my client or to land beneficiaries that the second appraisal had occurred. According to him, he did not know the results of the second appraisal. I question that, but there's nothing in the record to indicate that he was aware of the results of the second appraisal. If that is in fact an accurate statement, he certainly did not investigate what the results of that second appraisal were, and certainly did not advise my client or the other land beneficiaries of the existence of the second appraisal. And more importantly, when asked by Shirley Passley whether there had been a second appraisal, and the record shows that during a later meeting, months later, when she met with the estate attorney, she was given a copy of a letter from the bank indicating that they still felt like they needed an adequate appraisal, and she said, well, was there a second appraisal? And she was told both by the estate attorney and by Fred Krummel that no, there was no second appraisal. The bank appraisal was more than $285,000 higher than the first appraisal, which is more than 40% higher than Fred's appraisal. There are various issues that I'm going to go through, but most of them revolve around one crucial fact, and that is that Fred Krummel admits that he was indeed aware of the existence of a second appraisal, and he also acknowledges that he affirmatively told Shirley Passley that there was no second appraisal. And then also one of the big problems here that I think caused all the issues, the legal issues that I'm going to discuss is that the circuit court found factually that Fred Krummel did not know of the, and I'm quoting, the existence of the second appraisal. And there are numerous places in the record, both in pleadings, in testimony, where Fred Krummel has acknowledged that, yes, indeed, he did know there was a second bank appraisal. He just said, I didn't really think about it, I didn't order it, I didn't know what it said, but he certainly acknowledged that he knew that. He signed the HUD-1 transaction form that listed Mr. Richter, the bank appraisal, appraisal fee. He said he reviewed that HUD-1 form and he signed it. The appraiser said that he went out there and met with Fred Krummel when he did his, the bank appraiser, when he did his appraisal work. So there's lots and lots of evidence. And the appellees, it's sort of interesting because if you read through it, at times, I mean, I think they're sort of taking both sides. At times they acknowledge that, yes, indeed, he knew there was a second appraisal, he just didn't know the results. But then they also attempt to say that the circuit court did not err in finding that there, that Fred Krummel did not know the existence of the second appraisal. And I don't think you can have it both ways. Either he knew of the existence or not. And the, if the issue is, you know, what is the significance of the fact that there's no evidence that he knew the results? And that's what we're going to talk about. But that certainly did not authorize him not to advise my client of the existence of the second appraisal, and it certainly did not authorize him to represent her that there was no second appraisal. Is it relevant that the bank got that appraisal for their own purposes and not for the purposes of the negotiations between the parties? Absolutely not. Given his fiduciary duty, he was under a continuing obligation to, you know, not only to advise of everything he did know, but he would be under an obligation to investigate anything that would have been relevant and important. And I want to talk a little bit about the fiduciary duty issues. You know, we, there seems to be this focus, and the court focused solely on the executive trustee's intent. And there was also a narrow focus, I think, well, actually, the court didn't even indicate what the basis for that focus was. But in the briefing, I think the appellee believes that the reason that the court did that was based on language in the trust that indicated that should there ever be a desire or should it be desirable to sell the land, that it would be sold to the, the preference would be that it would be sold to the children, one of which was Fred Crumlin. And so I think there's been sort of a narrow focus on the self-dealing aspect of fiduciary duties. And I want to talk about that because that is not the only fiduciary duty in the case. And that's, I think that's a very critical distinction. In this case, the self-dealing issue goes to whether or not it was a theoretically permissible transaction. Can we even go forward with the transaction at all? And we do not believe that he could based on the trust, and I'll talk about that a little bit more, because we don't believe that the language in the trust falls under the HALIS and other cases, you know, standards about waiving a conflict for a fiduciary. But even putting that aside for a second, even if that's the case, even if they, if we say, well, if there was a waiver, then theoretically the transaction can go forward. The FLE seems to be taking the position, and I think the court sort of took the position that, you know, all bets were off that, that no other fiduciary obligations applied to the trustee after that point, that essentially, you know, he was able to negligently conduct the administration of the estate. I mean, he could just ignore, you know, know that there was a bank appraisal, know that he had a contract to purchase the land for its appraised value, and just not bother checking. I'm just not, I don't want to know. I'm not going to look. I'm not going to find out. And not only did he not take that effort, you know, he actually affirmatively told my client, no, there was no second appraisal. So the point I want to talk about is with the fiduciary duty, and this ties into your question, Your Honor, and that is because there are separate and distinct obligations under a fiduciary duty that are completely separate from whether or not this is self-dealing or not, whether the self-dealing is authorized, he certainly had an obligation to provide all relevant information, and not only that, but to go above and beyond and actually go and seek out any information that pertained. And so in addition to the duty of loyalty, there's a duty of full disclosure, and the cases that we've cited in our brief show that that duty is ongoing throughout the fiduciary representation. And indeed, one of the cases, I think it's the Genoa, it might be the Genoa case, said that even after somebody resigned from their post as a trustee, the fiduciary obligation was still going on with respect to the particular transaction that hadn't closed. So, you know, the fiduciary obligation is going to last at least as long as the latter of the, when the pertinent transaction closes or when the role of the executor or whatever role creates the fiduciary obligation ends. And indeed, Fred Krummel is actually still the trustee as we stand here today, and is still under an obligation, fiduciary obligation, to my client and to the other beneficiaries. So there's the duty of full disclosure, and that's a very serious duty under the laws of the state of Illinois. It's not a situation where you, I mean, they're trying to characterize it as a situation that you just disclose what you know. Under a fiduciary obligation, that's not the standard. The standard is to determine everything you can that's relevant to the transaction and provide that information. And the fact that he affirmatively said there is no second appraisal undermines any argument in that regard anyway. There's another distinct obligation, and that is I think the Zarkin, the Illinois Supreme Court case in Zarkin, talks about the duty of the trustee or the executor to secure for the beneficiaries the highest possible price when any trust property is being sold. And certainly in a situation like this where he is, particularly where he is buying the land from the beneficiaries, his obligation to, and also in the agreement, he says the agreement was, and people look at it, he doesn't describe the contract as a contract to buy the property for the price of my first appraisal. He says that the agreement was to buy the property at its appraised value, appraised value, not the initial contract or initial agreement that he describes, that's it. So what's the appraised value? And under the fiduciary obligation to secure for the beneficiaries the highest possible price, that certainly would encompass finding out the results of the bank appraisal and letting the beneficiaries know that. And there's also been some discussion in the briefing about sort of the battle of the appraisals. And I never tried to, you know, I never tried to go there because I don't think you can win that battle. I mean, you have two fine gentlemen who go out and appraise property and they have good credentials and good background, and nobody's ever going to be able to definitively state, you know, this appraisal is right and this appraisal is wrong or, you know, here's the magic mind in between that's right. The point about the second appraisal is that my client says that had she known that there was a second appraisal that appraised the land for $285,000 higher than the appraisal that Fred Krummel secured for himself, she would not have agreed to sell the land at that price. And it was certainly her right to make that decision. She had the right under the fiduciary law of the state of Illinois to have full disclosure of all material facts and to make that decision for herself. All right, so we discussed the briefly touched upon the different aspects of the fiduciary obligation. I want to go through them in a little bit more detail. Because of the court's findings, the court's focus just purely on the subjective intent of Fred Krummel and also on his focus just on the question of whether or not he engaged in bad faith and nothing else. The court did not even analyze the fiduciary law of the state of Illinois. First, he did not analyze the law on self-dealing, and in that, when a fiduciary engages in self-dealing, he must prove full disclosure, adequate consideration, and that the other party received competent and independent advice, none of which is established by this record. The court made no findings. He did not address the lack of full disclosure. And I also want to point out that under the law of Illinois, intent to deceive is not necessary to be shown for a violation of the lack of full disclosure under the fiduciary duty law. And there is an ongoing fiduciary obligation. So, Your Honor, your question about what did he know at the time of the original discussion, it's irrelevant because his obligation continues certainly through the completion and closing of the real estate transaction and really continues to this day. Finally, the court did not address the failure to secure the highest possible price and how his failure to identify the second appraisal or to investigate the results and provide that information to the land beneficiaries played into that. Now, I want to talk a little bit about the conflict waiver issue. The court did not address that in the order, and so we're speculating that that's the basis for his analysis of bad faith. And by the way, in case I run out of time, bad faith is not really the – that's not the only standard that applies. If indeed it's a lesser standard, it's bad faith, dishonesty, or – and I'm going light now. I'm a third one. But there are three elements under that that are just fully in my brief. And besides that, that only pertains to whether or not the self-dealing transaction can go forward. Those elements do not apply to the separate obligations under the fiduciary duty, the full disclosure, and the duty to provide the highest possible price. So back to the conflict waiver issue. The Hellis decision on which the athlete relies indicates that an executor or a grantor of a trust can waive a conflict in two ways. One is by expressly stating the waiver. In other words, I waive any conflict that arises from my son and Fred Hummel doing X. That's an express waiver. There is no express waiver in this trust. The second way is by placing the trustee in the conflict. And that's what they're arguing. They're arguing that he was placed in this conflict. However, in this case, the land beneficiaries are Shirley Pasley and her deceased sister, Major Bergard. And so, you know, this was – the provision that if it ever became desirable to sell the land, that I want preference to my kids, that would only come into play if the land beneficiaries decided that they wanted to sell their land. And the law says that a beneficiary of an estate doesn't consent to a conflict without a number of hoops that have to be jumped through, and that, again, that includes full disclosure and so forth, and I've outlined all of those. And so because this trust did not create a conflict, it just described a situation which if my client and the other clients decided to sell land could eventually come around, might create a conflict. So that's the first issue. The Bracken case that's also cited by Eppley in their brief provides a little bit more nuance to it. I think it's very helpful in this case. And it talks about whether or not somebody is a primary beneficiary of a trust or a remainder beneficiary. And in the Bracken case, they said that they distinguished cases in which the court found that the self-dealing transaction – hold on a second here – the Bracken case cited – or distinguished between whether or not somebody is the primary beneficiary of the trust or not. And if they are not the primary beneficiary of the trust, then the courts are much less likely or perhaps not – much less likely to find that the conflict was sanctioned. And in this case, Fred Crummel is neither the principal beneficiary of the land nor a remainder beneficiary. He's not a beneficiary of the land at all. And so between – if you combine the Hallis case and the Bracken case, the Hallis case says, unless there is an express waiver or the trust actually creates a conflict, and the Bracken case, which says, unless you are the primary beneficiary, it's not going to be deemed to be a conflict waiver. I think it's pretty clear that in this case there was not a conflict waiver. Now, setting all that aside, we get back to what the standards are. And the court applied a bad faith standard, and it's bad faith, dishonesty – and I had a nice little outline here, and I need to get back on it here so that I'm not forgetting my third – and abusive discretion, sorry. So if indeed there was a conflict waiver, then he's going to be liable for the self-dealing if there is bad faith, dishonesty, or abusive discretion. And in our brief, we've explained why he is guilty of all three. But again, that relates only to just the self-dealing aspect, whether or not there is a breach of fiduciary from that self-dealing. You still have to ask – and the court didn't even look at this. The circuit court didn't look at it. Separate and apart from that, was there a violation of the duty of full disclosure? Was there a violation of the duty to secure for the trustees the highest possible price? And so it's our position that there was no conflict waiver, but even if there was – and in particular, if you look at the Talti decision, it's a very factually similar situation to this. But in Talti, the buyer got his own appraisal. It wasn't a bank, a third party. That's true. But I don't think in a fiduciary – and that is a factual distinction. I don't think it's a legal distinction whatsoever, and the reason is the fiduciary obligation. If I'm a fiduciary and whether I order it or I know about it, I've got that obligation to notify the people that I'm serving in that fiduciary capacity. It's my obligation to ferret it out. And also, I think we need to point out that this is not – I mean, it's not some bank appraisal that they secured for some young moon. I mean, it's his appraisal. He paid for it. It's on his closing statement. This was for his loan. It's the appraisal for his purchase of the property. It's the appraisal that he paid for. I mean, I think legally one could argue, and I certainly would argue, that it is his appraisal. He may not have physically called the bank and said that I want to have an appraisal, but he testified he was aware that every time he borrowed money on land, there was always a bank appraisal for that purpose, and he was aware of it. And, again, the record shows that he paid for that appraisal as well. And the letter that's in the record that prompted my client to say, hey, wait a minute, was there a second appraisal, there is a bank letter that says we still need an adequate appraisal, and that was several months after he got his first appraisal. So, I mean, I question whether or not – I mean, in that situation, anytime I've ever borrowed money when the bank has to do an appraisal and you know you need an appraisal in order to get a certain amount of money, if you don't have a high enough appraisal, the bank's not going to lend you the money. You may not know specifically what the results of the appraisal are without actually checking, but what you do know is that appraisal is high enough that it was going to justify the loan that you were requesting.  Thank you, counsel. Counsel? Good morning. Please support, counsel. The letter from the bank that the appellant's counsel just referenced is marked Pesley exhibit 11 in the record, and that letter was to Mr. Crummell's attorney at the time who was handling the estate proceeds, and it just simply states that the bank will approve the financing subject to a satisfactory appraisal of $694,000 or greater. And $694,000 was the agreement that was reached between Fred and his sister for basically what was a buyout, a farm loan by Fred from his sister and the additional heirs to make this all work. And that agreement was reached in the summer of 2006. It was the court, Judge Knight, found that there was no fraud or deceitful propriety with that agreement. There was nothing wrong with the Wilson appraisal, which was the first appraisal that Mr. Crummell obtained in this case. The Wilson appraisal was an independent appraisal. That's where we start or where we essentially end the timeline for purposes of what conduct of Fred Crummell has to be considered by the trial court and by this court in reviewing the trial court's decision in this case. Mr. Crummell testified extensively at trial in addition to having filed an affidavit in response to the objection filed by the appellant in this case as to what he knew and didn't know about the second appraisal, the Richter appraisal. That transcript, the recorded proceedings, page 125, the Richter appraisal was never given to him. He went on to state that, yes, he knew from previous transactions that when he purchased land, if he was obtaining financing, there was going to be an appraisal by the bank. It was for the bank's purposes, not for his purpose. He didn't know. He had run into Mr. Richter out on the farm. Mr. Richter was out there a few weeks before the closing date, knew he was there looking at the land, but again, for the bank's purposes. It's not a situation, by concalty I believe, where there was an additional appraisal obtained for the purpose of the self-dealer trying to figure out, you know, what are they going to do with the property. Judge Knight found that all of the testimony of Mr. Crummell and the evidence presented in this case was convincing that he did not act in bad faith, that there was no dishonesty, that there was no abuse of discretion. Now, with regard to the issue here of is this a bad faith case or is it not a bad faith case, the trust language discusses that in the event it becomes desirable to sell the land, a firm settler desires to trustee in preference to her children for the purchase of that land, one of those being Mr. Crummell. Now, that's significant because Mr. Crummell initially proposed that the farm be – there would be a cash rent or a rental of the farm on his pathway and that he continue to farm it and pay her out a normal deal. She rejected that and said, no, I don't want to do that. He then comes back and says, okay, well, now we need to sell the land. And she says, okay. And then he goes and gets the appraisal. And that's where it turns that he is a preferred person. In fact, I think that you could arguably say, read that trust language, that to keep it in the family, he could have sold the land under an appraised value to one of the family members and followed the wishes of the settler in this case. So it is a bad faith case. And based upon the fact, the findings of the trial court, again, there was no bad faith by Mr. Crummell based on what he knew when he was going through the process. I'd like to note, I do have a concern with regard to the standard of review in the case. The appellant states that the standards of NOVO, based upon the motion to reconsider, was filed in this case. I think that that's the incorrect standard of review. That case, as she cites, in support of that proposition was a motion to reconsider following the grant of a summary judgment. I believe the appropriate standard of review in this case, based upon Judge Knight's order, is a manifest way to the evidence. Judge Knight went through extensively in his order for making findings of fact in the case. And even the issue of whether or not it's a bad faith case is based on the factual content of the trust. So I believe it's a manifest way issue of the standard of review. As an executor, if you know there's a second appraisal, don't you have a fiduciary obligation to find out what that appraisal is? Because if it's higher than your agreed price with your seller, you're still a fiduciary that has an obligation to the estate to get the highest amount of money. So you can just choose to be ignorant of the fact? I don't think that you can choose to be ignorant of the fact. But we're looking at a historical timeline of this transaction that encompasses about six to seven months from May of 2006, when the initial discussions between Mr. Crumlin and his sister occur as to what to do with the farm, all the way up to the end of December of 2006, when the transaction is closed. And the only fact, Judge, that perhaps puts that concern into play is the fact that Mr. Crumlin did run into Mr. Richter out on the farm, and Mr. Richter was out looking at the land in the process of doing the bank's appraisal. But when you look at the testimony, again, in the affidavit that Mr. Crumlin filed in response to the objection and the cross-examination of Bob's statements in that affidavit, he said, I knew that the bank would probably do an appraisal because that's what banks do when you go to borrow money. I didn't know what was in it. It was for the bank's purposes. I didn't ask for it. I didn't believe that I needed to or should have asked for it. Now, Judge Knight addressed your concern about can you just claim ignorance, not directly but indirectly through his order, where he said, you know, we've got two appraisals. Appraisals are essentially estimates as to the value of the land. This is not a situation where the day before closing in December – or let's go to the day of closing. They're up in the courthouse in Greenville in late December of 2006, and somebody walks in and says, you know what, I'll give you 3,400 acres for that farm. Now, that's a completely different situation if that is given to Mr. Crumlin. Then I think he, as trustee, has to put the brakes on and step back and figure out why. Because he has, you know, the value of the property, and ironically here with the economic meltdown, we all know what values were appraised five or six years ago are in most instances nowhere near what the values are today in terms of what somebody will actually pay for that land. Because really what the value of that property is what somebody will pay for it today, not really what these estimates are in the appraisals. And an appellant's counsel has discussed the fact that there was never a clear explanation given as to why we had the discrepancy in values of these two appraisals. Well, again, I think Judge Knight addresses that in his order where he goes through and says, again, these are estimates as to the value. There's a pretty significant difference. They are, Judge. I mean, they are. And for that short, that six-month window, again, there was no real valid explanation given except for the RIPTA appraisal, which was done to the bank, which hasn't been discussed yet today, covered additional tracts of land that were not part of the trust property. And so because Mr. Crummell, to secure that financing, had to pledge some of his independent property along with the property that he was buying from the trust to secure that loan to allow him to do the buyout. So there's a big jump. But, again, the issue is that at the time, and going back, again, addressing this concern about can the trustee just play dumb, when you go back to the time of the agreement, Judge Knight again may have finding, based on what he felt was convincing evidence, that there was no inappropriate by Mr. Crummell in conjunction with the Wilson appraisal, the first appraisal, at the time that the agreement was reached for the sale of the property. And Mr. Crummell conveyed that information to his sister. She went. She agreed on behalf of herself and the additional people who were entitled to receive the money under the trust that that was a satisfactory price. And they then moved on to closing the property. So I believe, based on the record here, that Judge Knight's order was correct as to the fact that there was no bad faith, no dishonesty, no abuse of discretion by Mr. Crummell in fulfilling his duties as trustee as to the disposition of the trust. What do you understand the relief they're requesting? And I know this, you want it to be affirmed, but what are they asking, to go back, have the property reappraised at the present value and put a value on it? I believe that the relief they're requesting, Judge Donovan, is that they want to obviously have Judge Knight's order vacated. We go back to Bond County and with, I think, some direction from this panel as to what to do with the land because we now have a situation where many years have passed. And there's a question as to, I believe now, when should the land have been valued? If an agreement to sell was reached, and that's kind of the problem with two appraisals, if an agreement to sell was reached in June or the summer of 2006, aren't we bound by that, the timing of that agreement as to the value of that land at that time? And there's much concern, as the court will see through the record, about making sure that what we are here today is property for you all jurisdictionally, or jurisdiction-wise, because we still have additional issues under the administration of the trust that are not related directly to the value of the agreed-upon price of the farm. Well, the value of the property today could be less than either value stated here. And, in fact, and oftentimes I think that in these cases we have to be obviously very cognizant, we have to stay within the record, but to contrast this, had the Richter appraisal been $1,000 below the Wilson appraisal, would Mr. Cromwell have had any right to undo the agreement? He'd have to sell it for the highest price. So that's why I think that within the confines of this case we have to look at the appraisal, the known appraisal at the time, subject to some certain discretion that we are not dealing with a situation where the land is appraised in 2006, the agreement is reached in 2006, but there's not a closing until 2010. I mean, that would be ridiculous, and that's a ridiculous example. But, again, we are within a reasonable timeframe from the date the property is appraised, agreement is reached, property closed. So should the court determine that it would be necessary to – I guess you have a number of options in terms of vacating the order outright, sending it back for a new trial, vacating the order and sending it back with directions. But really I think what they're asking is that – they're asking that you don't go to the bad faith issue, that you find that there was a self-dealing issue, and that based upon that you essentially void the transaction between Fred and Shirley that was agreed upon in June of 2006. So then we go back and we start over probably a status conference with Judge Nines and say, oh, here's the receipt. So in regards to that, it's somewhat confusing. But, again, I think that when this panel looks at the record and looks at the language that's in the trust that, again – Zedman's is absolutely correct. There is no blanket, clear waiver of the conflict in the trust language. But, again, that's not required in real cases, and I think that it's reasonable when the settler makes the trustee one of the preferred buyers. And, again, many of the cases, the House case, the Soli case, they're talking about businesses and stock and things like that. We're talking about farmland that's been a family farm for generations, and there was a preference in that trust. And Mr. Crummell had stayed behind. Farmerland, there's a preference in there to keep that farmland in the family, as there are in hundreds if not thousands of trusts in this state and every other state that has heavy agricultural business. So in that regard, he was a preferred buyer. He was a trustee. I think that takes away the subdealing issue. It goes as to whether or not it's a bad faith issue. And looking at all of the evidence as to what Mr. Crummell knew, there was no bad faith. Did he pay her the money? Yes. Did the loan pay her the money? Yes, the loan was closed. We are somewhat at a disadvantage because we weren't the estate administration. We're the trial lawyers. But from what I believe is through the record, we'll show that all the money was eventually paid out over, I think, a couple of payments in 2007. Thank you. Thank you, counsel. Counsel? Just to answer that question quickly as far as when the money was paid. The record would show that in, I believe, February, the February after the land transfer, I think that's February of 2007, my client received a distribution. And that was her first sort of bell ringing that this land transaction might have gone through. That's the point at which she started raising questions. She also, unfortunately, had a heart attack the same month, and so it was not until June that she actually – the testimony shows she started calling the estate attorney saying, what's going on? Did this land transfer go through? And he didn't. Okay, let me ask you this. Yes. She got the $654,000. And if we reverse this, what do you want us to do? Well, first of all, she got half, and I don't think she got all. There was a partial distribution of the proceeds. I don't think of a complete distribution. And we're looking to rescind the transaction. If that happens, I think she'll have to give some of the money back, and then we'll have to go back to her. She'll give the land back, and then there will have to be some – and I think there are still – You could take it back, and we start from scratch as if there's been nothing, and it will be sold at the value it is when it lands back there. Or she can keep it. She can do whatever she wants with her half of the land. And by the way, she may not give the money back because another issue that's not before you is that the entire time from the time that Mary Fern Crummel passed away, Fred started – he asked if he could rent the land, and she said no, and he went ahead and firmed it anyway, and he took all the income. And that's in the court's order, I believe. But that's not part of this appeal. That's not part of this appeal, but there may be an offset between what is owed to her on an income and what she would have to pay back. So that's going to be a separate question. If it goes back, what day do we value this land at? I don't think you have to value it. Or when is the trial court going to – it's got to either be sold out or somebody is going to appraise it again or something like – If she gets the land, if she just inherits the land and a deed is transferred to her, nobody has to sell it. Nobody needs to know what the value is. Oh, okay. You would just want the land. Right. And I don't know. She may the very next day sell it, or she may decide that with the economy the way it is right now that she'll hold that land. I don't know. But the point is we're not asking for a convoluted financial transaction. We're asking to rescind. And the law under fiduciary duty is that when somebody is – when a trustee or a fiduciary is involved in the transaction and violates the fiduciary duty, then the transfer is to be rescinded, or at the option of the other party it may be rescinded.  If she takes the land, she has to give the money back, does she have to pay interest on the money? She might. But, again, there's a whole other separate accounting issue where he owes her money because he took the income from the land. So there's probably going to be some offset between the two. I don't know whether she'll end up writing him a check or whether he'll write her a check. I don't know. She got what she asked for. I don't think she got the – In the agreement. I mean, we can always say somebody else would pay more, but there's no violation of the agreement that they made. Well, we don't believe there was an agreement because there was an oral discussion. She still thought she was going to get a contract, and then six months later she finds out it went through. She was never given the paperwork, and she never knew that it was a deal. She never thought it was a deal, never knew it was a deal, never knew it went through. So he's contending there was an agreement. There was a preliminary discussion, certainly, and I think she indicated that she was willing to sell the land to him at the appraised value. But in any real estate transaction, you can have an oral discussion. You're supposed to get the contract. Now, the court found there was a contract in his order, didn't he? I don't know that he used the word contract, but I believe he did. Said there was an agreement. He believed there was an agreement. And what's the standard of review on that? Well, I think there are two applicable standards of review, and it kind of depends on whether you guys – how you feel about the bad faith, but that only deals with the self-dealing and not the other issues. Our position is that the court misapplied legal standards to the past. That's a de novo review. Questions, specific questions, factual questions or factual determinations that the court made, I think the manifest way to the evidence applies to those. For example, the assertion that – about the existence. Oh, I don't have much time. I'm going to respond really quickly. Let's see. Most of these, I think, were okay. Oh, I just wanted to point out. Counsel, I believe, has admitted in front of you all that his client did indeed know of the existence of the second appraisal. And that's the crux of the error if you look at the court's order. The court very specifically says that Fred Crummel did not know of the existence of the second appraisal, and that's just not borne out at all by the record, and even his attorney standing here today does not contend that that's the case. And he mentioned that there was additional acreage. I want to point out that the difference in value we're talking about, though, even though there was additional land, I think, that was mortgaged in order to get the loan, the difference is on the specific land that we're talking about that was part of the trust. So that difference of $285,000, that's not from additional land. That's from the acres in question. All right. Thank you, Your Honor. Thank you. We appreciate the briefs and arguments of counsel. We will take the case under advisement. Court will be in a short recess.